(111 So. 686)

No. 26348.

## PERKINS v. MEEKER SUGAR REFINING CO.

(Jan. 31, 1927. Rehearing Denied Feb. 28, 1927.)

*(Syllabus by Editorial Staff.)*

1. **Bailment** ⬅➡23—Contract held to make weights of public weighers at port of entry applicable in determining amount sugar refiner should deliver.

Under contract for refining sugar, providing that copies of weights should be delivered to refiner's agent at port of entry, weight of raw sugar, as ascertained by public weighers at such port, governs in determining number of pounds of refined sugar which contract bound refiner to deliver.

2. **Contracts** ⬅➡284(4)—Contract's provision as to method of determining quantity or weight of produce or other articles, or person or class of persons by whom quantity or weight is to be ascertained, binds parties, in absence of fraud or error.

Provision of contract as to method of determining quantity or weight of produce or other articles, or person or class of persons by whom quantity or weight is to be ascertained, binds parties, in absence of proof of fraud or error.

3. **Bailment** ⬅➡32—Damages for failure of refiner to deliver sugar held to be based on value of sugar at time of such failure, less charges for refining undelivered sugar.

In action against sugar refiner for failure to deliver proper amount of refined sugar, plain-

tiff was entitled to damages based on value of sugar at time of such failure, less charges for refining undelivered sugar.

4. **Bailment** ⬅➡32—Sugar refiner, telegraphing agent that it would pay storage of sugar for plaintiff, if necessary, held liable therefor, and for incidental expenses.

Where contract for refining sugar provided that plaintiff's sugar should be refined as soon as that of others was completed, even if doubtful as to who was liable for storage charges on plaintiff's sugar pending refinement, telegram by refiner to its agent that it would pay storage, if necessary, and agent's making arrangements therefor, made refiner liable for storage and for expenses necessarily incidental thereto.

5. **Bailment** ⬅➡32—Refiner liable for expenses of storage of sugar held not liable for insurance thereon.

Where sugar refiner was liable for storage until sugar was refined and expenses necessarily incident thereto, it was not liable for insurance thereon, in view of fact that owner would have had to pay it, even if refiner had received sugar and held it until, according to contract, it could have been refined.

6. **Bailment** ⬅➡32—Sugar refiner held not liable for interest on loans to enable owner to hold sugar stored pending refining.

Although sugar refiner was liable to owner for storage and expenses necessarily incident thereto for holding sugar until he could refine it, he was not liable for interest on loans to owner to enable him to hold sugar, in view of fact that owner would have had to bear such expenses if refiner had received sugar and held it until, according to contract, it could have been refined.

7. **Bailment** ⬅➡32—Failure of sugar refiner promptly to claim damages for causing cessation of operations held to prevent recovery therefor.

Where sugar refiner failed to claim damages under contract for failure of owner of sugar to deliver enough to keep refinery running, causing cessation of operations, until he was sued by owner on contract, he could not recover therefor.

8. **Appeal and error** ⬅➡1109—Where, pending appeal, plaintiff made assignment for creditors, judgment rendered will be in favor of committee.

In action on contract, where, pending appeal, plaintiff assigned all assets, including such claim, for benefit of creditors, judgment ren-

dered will be understood as being in favor of plaintiff's committee.

Appeal from Thirteenth Judicial District Court, Parish of Rapides; J. A. Williams, Judge.

Action by Bishop C. Perkins against the Meeker Sugar Refining Company, wherein defendant set up a claim in reconvention. From a judgment for less than he asked, plaintiff appeals. Amended and affirmed.

Lemle, Moreno & Lemle, of New Orleans, for appellant.

Charles F. Vogel, of Chicago, Ill., and White, Holloman & White, of Alexandria, for appellee.

OVERTON, J. This is a suit for damages for the alleged breach of a contract to refine 15,000 bags of raw sugar, the damages claimed, amounting to $14,688.21. An insight into the contract, on which the suit is based, and the chief obligations of the parties thereunder, may be best gathered by quoting some of the articles of the contract. The articles referred to read as follows:

"First. Commencing, immediately after the party of the second part has fulfilled its said contract, to refine ten thousand (10,000) bags of raw sugar for said J. Aaron & Co. and its said contract to refine ten thousand (10,000) bags of raw sugar for Penick & Ford, Lt'd (it being estimated that these would be completed in the latter part of April, 1920), the party of the first part (plaintiff) agrees to furnish to the party of the second part (defendant) fifteen thousand (15,000) bags of raw sugar for refining, to require the entire refining capacity, in continuous daily operation, of the refining company's refinery at Meeker, La., until the completion of the refining of said fifteen thousand (15,000) bags of raw sugar; and the refining company agrees, immediately upon the fulfillment of its said contracts to refine said ten thousand (10,000) bags of raw sugar for J. Aaron & Company and ten thousand (10,000) bags of raw sugar for Penick & Ford, Lt'd, to devote the entire refining capacity of its said refinery to the refinement of said fifteen thousand (15,000) bags of raw sugar for the party of the first part (as hereinafter more particularly provided),

using the Norit process. The present capacity of said refinery is approximately two thousand (2,000) short tons, of two thousand (2,000) pounds each per month.

"Second. The party of the first part agrees to pay at the rate of two dollars and seventy-five cents ($2.75) per one hundred (100) pounds of raw sugar delivered, to be manufactured into refined.

"Third. From each one hundred (100) pounds of raw sugar testing ninety-six (96) degrees polarization, public weigher weights and accepted settlement tests on all raw sugars delivered to govern, the Meeker Sugar Refining Company agrees to produce for the party of the first part ninety-three (93) pounds of standard granulated sugar, run of the granulators, testing not less than ninety-nine and seven tenths (99.7) degrees polarization at the refinery, to be packed in one hundred (100) pound, new, cotton lined burlap bags, printed in black, one side only, or packed in barrels, at the option of the Meeker Sugar Refining Company.

"Fourth. The party of the first part shall, immediately upon ascertainment of the public weighers' weights and accepted settlement polarization tests on all raw sugars delivered, furnish the Meeker Sugar Refining Company, at Meeker, La., or their accredited agent at the port of entry, an accurate and complete copy and report of each and every one of such weights and polarization tests.

"Fifth. Raw sugar testing above or below ninety-six (96) degree test shall be adjusted to a ninety-six degree test basis in determining refined production weights that must be produced by the refining company—that is to say, the basis is ninety-three (93) pounds of refined for every one hundred (100) pounds of ninety-six (96) degree test raw sugar.

"Sixth. Immediately upon the fulfillment by the party of the second part of its said contract to refine ten thousand (10,000) bags of raw sugar for said J. Aaron & Co. and its said contract to refine ten thousand (10,000) bags of raw sugar for said Penick & Ford, Lt'd, the party of the first part agrees to deliver fifteen thousand (15,000) bags of raw sugar on which duties and all other charges have been paid, except railroad freight and handling charges not to exceed twelve and one-quarter (12¼) cents per one hundred (100) pounds, from Westwego, La., to the Meeker Sugar Refining Company, at Meeker, La., in sufficient quantities to guarantee continuous daily operation at the refinery, to the full capacity of the refinery, until the completion of the work of refining said fifteen thousand (15,000) bags of raw sugar for the party of the first part. It is further agreed that the

party of the first part .shall, from and after the start of said deliveries, keep approximately a ten days' supply of approximately four thousand (4,000) bags of raw sugar on hand continually, or sufficient raw sugar for continuous operation at Meeker, La., and the Meeker Sugar Refining Company agrees to store, free of charge, an amount up to six thousand (6,000) bags.

"Seventh. The refining company agrees to pay freight, to the extent of eleven and one-half cents (11½¢) per one hundred (100) pounds, the total amount of such freight and handling charges not to exceed .twelve and one-quarter cents (12¼¢) per one hundred (100) pounds, on raw sugar, other than Louisiana sugar, from Westwego, La., via the Texas & Pacific Railway, and all handling charges at Meeker. Any storage charges that may accrue at the Texas & Pacific Railway warehouse at Westwego, or any other warehouse, it is hereby agreed, are to be paid by the party of the first part. * * *"

Plaintiff alleges that, acting under the foregoing contract, he shipped to defendant 4,795,920 pounds of raw sugar, as appears from public weighers' certificates furnished the latter, for which defendant should have returned to him, under the contract, 4,442,470 pounds of granulated sugar, but returned only 4,398,000 pounds thereof, thus leaving a balance due him of 44,470 pounds, which at the market price, then prevailing, of 24.52 cents a pound for such sugar, would have netted him $10,904.04, which sum he alleges he is entitled to recover. He further alleges that it was the duty of defendant under said contract to accept the sugar to be refined, when tendered, and to refine it after the completion of the contracts that it had entered into with J. Aaron & Co. and Penick & Ford, Limited, but that defendant failed to accept deliveries at its refinery in May, 1920, and that, due to that failure, and acting under instructions from defendant's agent, he (plaintiff) caused 5,592 bags of sugar to be stored in a warehouse in New Orleans, during the entire month of May, 1920, at a cost for storage of $940.38, and also caused to be stored, during the entire month of June, 1920, 4,346 bags, at a cost of $434.60; that, in addition to these

charges, he paid for the switching and handling of the sugar, thus stored, from the docks in New Orleans to the warehouse, the sum of $270.48; for demurrage. on cars at the warehouse, $67.98; for insurance during the time of storage, $623.65; for the loading of the cars, $341.78; for interest on loans, which he was compelled to make in order to hold the sugar stored, $1,105.30, which expenses he alleges were necessary, due to defendant's failure to accept delivery. Plaintiff sues for these expenses.

Defendant, for answer to the foregoing demand, avers that plaintiff delivered to it only 4,762,372 pounds of raw sugar, instead of 4,795,920 pounds thereof, and hence, under the contract, it should have returned to plaintiff 4,410,143 pounds of granulated sugar, instead of, as claimed by plaintiff, 4,442,470 pounds; that it has returned to him 4,398,000 pounds, leaving still due him 12,143 pounds, but subject to a claim which is set up in reconvention. The claim so set up is for damages which defendant alleges are due it by plaintiff, because of the latter's failure to supply it, under the terms of the contract, with a sufficient quantity of sugar to keep the refinery running continuously until all of the raw sugar, which plaintiff was to deliver, was refined, as a result of which the refinery had to cease operations on June 28, 29, and 30, 1920, at an expense of $2,598.06, and on July 9, 10, and 11, 1920, at an expense of $3,199; making a total expense of $5,797.06.

One of the principal facts to be found is the number of pounds of raw sugar delivered by plaintiff to defendant at Meeker to be refined. The finding of that fact and of the average polariscopic tests will furnish the necessary facts to determine, under the contract, the number of pounds of granulated sugar which defendant was called upon to return to plaintiff. The raw sugar, prior to shipment to Meeker, was weighed by public

weighers in New Orleans, licensed by the Sugar and Rice Exchange, and was found, according to corrected figures, to weigh 4,-773,420 pounds, or 22,505 pounds less than the number of pounds alleged by plaintiff to have been shipped; the difference being due to an error in addition, made in ascertaining the total weight from the certificates of the public weighers. As the various shipments reached Meeker, they were weighed by defendant's employees, who were engaged by it for the purpose of weighing sugar, and were found to contain a total of 4,762,372 pounds. This total is somewhat above the weights, found by the railway companies, upon which the freight charges were based, and is considerably less than the total of the weights found by the public weighers.

[1] The sugar, weighed in New Orleans by the public weighers, was shipped. There seems to be no complaint that the number of sacks to be delivered were not finally delivered, or that any of the cars reached Meeker in such condition as to show that parts of the shipments had been lost or stolen in transit. The solution of how many pounds of granulated sugar defendant was required to return to plaintiff is, therefore, largely narrowed down to answering the question, Whose weights should be accepted? The contract, we think, answers this question. In the third article thereof, as we have seen, it is provided that—

"from each one hundred (100) pounds of raw sugar testing ninety-six (96) degrees polarization, *public weigher weights* and accepted settlement tests on all raw sugars delivered *to govern* the Meeker Sugar Refining Company agrees to produce for the party of the first part ninety-three pounds of standard granulated sugar. * * *" (Italics ours.)

There were no public weighers at Meeker, which is only a railroad station, at which there is a refinery. The only persons there doing any weighing were persons employed by defendant, who were in no sense public weighers. Defendant's employees were evidently not the weighers intended by the contract.

But defendant contends that Meeker, the point of delivery, was the logical point at which to weigh the raw sugar for the purposes of the contract, and hence that the weighing done by its employees there should be accepted. However, the contract not only makes it clear that the weighing, contemplated by it, should not be done by defendant's employees, who were not public weighers, but also makes it clear that it was contemplated that the weighing was expected to be done at some other place than Meeker, for by the fourth article of that instrument it is provided that "the party of the first part shall, immediately upon ascertainment of the public weighers' weights and accepted settlement polarization tests on all raw sugars delivered, furnish the Meeker Sugar Refining Company, at Meeker, La., or *their accredited agent at the port of entry*, an accurate and complete copy and report of each and every one of such weights and polarization tests." (Italics ours.) If the raw sugar was to be weighed at Meeker, why the provision for the delivery of copies of the weights to defendant's agent at the port of entry? Obviously, the reason for that provision is that the parties to the contract contemplated that the weighing would be done at the port of entry, which, in this instance, was New Orleans.

[2] Our conclusion is that, by the terms of the contract, the weight of the raw sugar, as ascertained by public weighers at the port of entry, should govern in determining the number of pounds of granulated sugar that should be returned for each 100 pounds of raw sugar shipped, making allowance for any raw sugar weighed that was not shipped or delivered. The contract is the law between the parties. Where a contract provides the method of determining the quan-

tity or weight of produce or other articles, or the person or class of persons by whom the quantity or weight is to be ascertained, such provision is binding upon the parties thereto, in the absence of proof of fraud or error. 35 Cyc. pp. 211, 212.

The public weighers' certificates were identified by the weighers, and a prima facie case as to their correctness was made, which, in our view, has not been overthrown by showing either error or fraud in them. These certificates show that the raw sugar weighed 4,773,420 pounds. The raw sugar weighed was shipped. It does not appear that any of it was lost in transit. It is admitted by both sides that the average polariscopic test was 95.7867 degrees, which, under the contract, entitles plaintiff to 92.6302 pounds of granulated sugar for each 100 pounds of raw delivered. Since we find that plaintiff delivered 4,773,420 pounds of raw sugar, this entitled him in return to 4,421,628 pounds of granulated sugar. Both litigants agree, as appears from their pleadings, that defendant returned to plaintiff 4,398,000 pounds of granulated sugar. Hence it appears that defendant has not delivered to plaintiff 23,628 pounds of granulated sugar, which it should have delivered to him, under the contract.

[3] Plaintiff has sued for the value of the sugar which defendant has failed to deliver to him as of date the contract was breached. Defendant insists that it has the right to discharge its obligation by delivering other sugar of equal grade, and, in the event a moneyed judgment should be rendered against it, that the amount should not exceed the value of the sugar at the time this suit was filed. We think it clear that plaintiff is entitled to damages for the value of the sugar at the time the contract was breached by failing to deliver, less the charges for refining the undelivered sugar. In no other way is it possible to grant plaintiff full compensation for the breach. The value of the sugar at that time was 15 cents per pound. This entitles plaintiff to judgment for $3,544.20 for the 23,628 pounds, not delivered, less the charge for refining the raw sugar, required to manufacture the 23,628 pounds of refined, at the contract rate of $2.75 a hundred pounds, based on the raw. This charge amounts to $704.46, which leaves $2,839.74, to which plaintiff is entitled for the sugar undelivered.

[4] The next issues presented for consideration are those relating to the storage of 5,592 bags of raw sugar in a warehouse in New Orleans for the month of May, 1920, and for a part of the same lot, amounting to 4,346 bags, for June of that year, for which plaintiff claims certain expenses which were paid by him, and to which he was put, which we have detailed above. The necessity for storing this sugar grew out of the inability of defendant to receive it at Meeker.

The contract between the parties for the refining of the sugar provided that work to that end would begin after defendant had fulfilled its contract with J. Aaron & Co. and Penick & Ford, Limited, which the parties, as appears from the contract, estimated would be about the latter part of April, 1920. Plaintiff, in view of the estimate made, as to when the refining of the 15,000 bags, which he desired manufactured into granulated sugar, would begin, purchased raw sugar on the market in order to be prepared to comply with his part of the contract. On April 24, 1920, plaintiff wrote defendant as follows:

"Referring to our contract with you for 15,-000 bags raw sugars to be tolled, we expect two boats in here (New Orleans) in the next few days with 10,500 bags of sugar, part of our contract. This sugar will be forwarded you in regular order."

The day prior to the writing of the foregoing letter, Mr. Rose, who represented the Sugar Producers' Distributing Corporation, which was acting as defendant's broker, wrote defendant that plaintiff refused to pay

storage charges, etc., on this sugar, and hence that plaintiff would ship at once, but was willing to store the sugar until defendant was ready to receive it, provided defendant would pay the expense of doing so. On April 25, 1920, defendant sent Rose a telegram in which it said:

"Impossible to handle any sugar here now for Perkins. Have not yet finished Aaron lot. You arrange to store Perkins sugar Westwego, and if necessary will pay storage, but stop shipment until can handle here. Please act promptly. Phone result."

On May 5, 1920, Rose wrote defendant a letter in which he said:

"I took up with Mr. Bishop C. Perkins (plaintiff) the matter of storage of his sugars at Appalachian warehouse. Mr. Perkins takes the position that he explained to you distinctly when he expected his sugar, and that there was nothing said about his having to store these sugars at his own expense and absolutely refuses to pay one cent of this cost. He is considerably put out because of the delay of Meeker, and claims to be losing a considerable sum of money because of this delay, and instructed me to notify you that he expects you to absorb every dollar of expense connected with the handling and storing of these sugars."

On May 6, 1920, Rose wrote defendant a letter advising it that the sugar, which it had ordered stored at the Appalachian warehouse, was being stored there, and that later he would send defendant the expense incident to the work.

Defendant contends that no reason existed why it should have the sugar stored at its expense, since it was not obligated to receive it until the Aaron contract, which was still being executed, had been completed, and, moreover, that Rose was not authorized to enter into any agreement which would obligate it to pay the expense that the storage of the sugar would entail.

[5, 6] Whatever merit defendant's first position may have had, when the question of storage or shipment first arose, defendant renounced the benefits to be derived from that position, when it telegraphed Rose to arrange for the storage of the sugar, even if to do so would make it necessary for it to pay the storage. This telegram left it to Rose to determine whether it would be necessary to arrange for the storage at defendant's expense. Rose found that this would be necessary, made the arrangements, and so advised defendant. The latter at no time questioned what Rose had done, so far as the record discloses, until after the sugar had been taken out of storage. In our opinion, defendant is liable for the storage, which, for the two months mentioned, amounts to $1,374.98, and should reimburse plaintiff for paying it. Defendant is also liable for the expenses necessarily incidental to storing the property, and should reimburse plaintiff for paying them. These expenses are as follows: For the loading of the sugar on cars, $341.78; for switching and handling the sugar from the docks to the warehouse, $270.48; for demurrage on cars at warehouse, $67.98; making a total, including storage, as well as incidental expenses, of $2,055.22. Whatever doubt there may be as to the sufficiency of defendant's telegram to authorize Rose to incur these incidental expenses, we think is removed by the fact that Rose advised defendant that they would be necessary, and defendant raised no objection to their being incurred until after the sugar had been removed from storage. As relates to the item of $623.65 for insurance paid by plaintiff on the sugar, during the period of storage, in our view, plaintiff is not entitled to recover this item from defendant. The contract provides that plaintiff shall pay insurance on all sugars handled under it. The item is not one which plaintiff had to bear by reason of the storing of the sugar, but is such a one as he would have had to pay, even though defendant had received the sugar, and held it until it could have reached it for the purpose of refining it, after having, with due dil-

igence, which it seems to have exercised, completed the refining of the Aaron and the Penick sugars. The same is substantially true as to the item of $1,105.30, claimed by plaintiff, for interest on loans, made by him to enable him to hold the sugar stored. This item would have had to have been borne by plaintiff, even though the sugar had not been stored, but instead received by defendant, and held until defendant, agreeably to the terms of the contract, could have refined it. Both of these items should be rejected.

[7] The remaining issue to be considered is raised by the reconventional demand. In that demand, as appears from what we have said, defendant claims that it is entitled to recover from plaintiff damages, amounting to $5,797.05, occasioned by the failure of the latter to keep it supplied with sugar during the period required for refining the 15,000 bags, thereby forcing defendant to close the refinery for three days in June and for a like number of days in July, at an expense amounting to the damages claimed.

The contract provides that plaintiff, during the period of the execution of his contract, shall keep the refinery supplied with a sufficient quantity of raw sugar to prevent a cessation of operations, and, in the event he should fail in this respect, and it should become necessary for that reason for the refinery to shut down, then that plaintiff should pay the average daily labor cost, during the period of cessation, as shown by defendant's pay roll, such labor cost to be included in the weekly cash settlements. The contract also provides that defendant shall be authorized to draw on a bank in New Orleans, upon each Tuesday, during the period of the contract, for the amount of the refining and toll charges, or other charges provided for by the contract, which, of course, includes the labor cost, during the period of a shutdown, due to plaintiff's fault, for these are charges provided for by that instrument.

Defendant introduced the evidence of several witnesses to show that the refinery was shut down during the periods mentioned, by reason of the failure of plaintiff to supply it with sugar. On the other hand, it appears that, if the refinery was shut down for the reason stated, no claim was made, at the close of the weeks in which it is contended the shutdowns occurred, for the damages, or for any part of them, occasioned thereby, although the contract expressly authorized defendant to include in its weekly drafts for charges for refining, which were drawn, the average daily labor cost for all shutdowns for which plaintiff was responsible, nor does it appear that defendant in any of its letters or reports to plaintiff mentioned these shutdowns, or notified him of its intention to present a claim to him, because of them, although the cost of a shutdown is considerable. It does not appear that plaintiff was even notified that, due to the scarcity of sugar on hand, a shutdown was about to occur. The only evidence in the record tending to show that notice was brought home to plaintiff that the refinery had to temporarily cease running, because of the failure of plaintiff to supply it with sugar, is the evidence of one of defendant's officials to the effect that he so notified a person in plaintiff's office, in a conversation by telephone, but the person with whom the conversation was had denies that any such notice was given. The first notice that plaintiff had of this claim was when defendant filed its reconventional demand setting up the claim.

In our view, defendant's silence as to this claim until its reconventional demand was filed creates a strong presumption that some reason existed why plaintiff should not be charged with the cessations of operations complained of, and that defendant felt, at the time that they occurred, that they were not due to plaintiff's fault, otherwise it is improbable that it would have remained silent

in a matter of so much importance. We think that this silence, under the circumstances stated, casts such uncertainty on defendant's claim as not to justify us in allowing it. We moreover think that the failure of defendant to notify plaintiff that the shutdowns were about to occur, so as to give him an opportunity to avoid them, if possible, or to mitigate the damage, is, of itself, sufficient to defeat defendant's claim.

The trial court rendered judgment in favor of plaintiff for $921.96, the value of the granulated sugar which defendant admitted it had not delivered to plaintiff; this being the value at the time this suit was filed, and rendered judgment in favor of defendant upon its reconventional demand for $5,797.06, with legal interest thereon from judicial demand, as damages, for the alleged failure of plaintiff to supply the refinery with sufficient sugar to continue operations without interruption. The judgment will have to be modified so as to correspond with the views here expressed.

[8] Pending the appeal, plaintiff made an assignment for the benefit of his creditors, of all of his assets, including the claim herein sued upon, to G. Owen Vincent, J. F. Flournoy, and Felix V. Gunter, as a committee of his credtiors, which committee has been substituted as party plaintiff in lieu of Perkins, the original plaintiff. The judgment to be rendered must therefore be understood as being in favor of said committee, as plaintiff.

For the reasons assigned, the judgment appealed from is amended by increasing the amount allowed plaintiff from $921.96 to $4,-894.96, and by rejecting defendant's reconventional demand, and condemning defendant to pay the costs of the lower court, and, as thus amended, said judgment is affirmed at defendant's cost, the judgment to be understood as being in favor of said committee, as plaintiff.