(118 So. 323)

No. 29071.

RAY v. ALEXANDRIA ICE & COLD STORAGE CO., Inc.

July 2, 1928. Rehearing Denied Oct. 2, 1928.

Overton & Hunter, of Alexandria, for appellant.

John L. Pitts, Jr., and Hawthorn & Stafford, all of Alexandria, for appellee.

ROGERS, J. This is a fish story. The fish involved in the story were owned by the plaintiff and were stored in the cold storage plant operated by the defendant company. The suit is to recover $16,884.97 as damages for the alleged deterioration of the fish while they were in storage. The court below gave plaintiff judgment as prayed for, and defendant appealed.

The contention of the plaintiff, briefly stated, is that the fish were delivered to defendant in good condition, and it was defendant's obligation, both legal and contractual, to return them in like condition. In support of his contention, he relies on Civ. Code, arts. 2937 and 2938, and upon defendant's agreement, appearing on each receipt for fish, in the following language, viz.:

"This company guarantees temperature only. Damage to goods for other reasons are at owner's risk."

Plaintiff argues that the damage to his fish was caused by the failure of the defendant to furnish and to constantly maintain the temperature necessary to preserve them.

The defendant does not seriously dispute the correctness of plaintiff's contention relative to the condition of the fish when received and returned. Its defense is, substantially, that, under its arrangement with plaintiff, the fish were delivered to and handled in its

storage plant exclusively by the employees of plaintiff, who had entire supervision of the work, and that the negligent manner in which the work was performed caused the damage to the fish. Defendant invokes Civ. Code, art. 2945. Defendant further contends that plaintiff was better advised of the conditions, and that, notwithstanding his present claim the place was unfit for the purpose and the proper temperature was not being maintained, he continued to store his fish, withholding from defendant the knowledge of their deterioration and of his losses resulting therefrom; that, in these circumstances, plaintiff and not defendant was at fault, and, therefore, plaintiff is not entitled to any recovery.

Plaintiff is a wholesale dealer in certain fresh water fish to be found in the streams of this state. Prior to the year 1923, plaintiff and the manager of the defendant company experimented in the freezing and storing of fish, and, as a result of the experiment, entered into an agreement whereby, in the year 1923, defendant constructed a sharp freezer, equipped two existing vaults, Nos. 5 and 6, and built three other vaults, Nos. 14, 16, and 18, for storing plaintiff's fish. The method used in storing the fish is, substantially, as follows, viz.: Upon their delivery to the defendant's plant, they are placed in the sharp freezer, where the temperature is maintained at 15 or 20 degrees below zero, Fahrenheit. The fish are kept in the sharp freezer from 12 to 24 hours, until they are frozen stiff. They are then dipped in water, which forms a thin coating of ice, known as a glaze. After this is done, they are deposited in the storage vaults, where the temperature should be maintained at approximately 10 degrees above zero, Fahrenheit.

Under the original agreement between plaintiff and defendant, plaintiff merely delivered his fish at the plant to defendant's employees, who handled and took care of them until they were redelivered to plaintiff upon his demand. This arrangement continued in force until some time during the year 1924, when a new agreement was entered into between the parties, by virtue of which plaintiff himself undertook, through his employees, to handle and take care of the fish in the plant of defendant. Under this agreement, the storage charges were materially reduced.

About May 1, 1924, plaintiff began storing the fish for the alleged loss on which damages are herein sued for. He continued to store the fish, with such removals as the requirements of his business demanded, until the latter part of October, 1925, when the five vaults at his disposal in defendant's plant were practically full.

On March 30, 1925, plaintiff shipped 22,100 pounds of fish to the Lay Fish Company, of New York. The fish, on their arrival at destination, were rejected by the consignee on account of their poor condition. The fish were subsequently sold by plaintiff to the Eagle Fish Company, of New York, at a loss of $5,171.72. Prior to this sale, to wit, on March 20, 1925, 1,208 pounds of fish, valued at $456.96, were thrown away, being unfit for human consumption. On June 6, 1925, 1,035 pounds of fish, valued at $337.15, were also disposed of in the same way for a like reason. All of these fish were removed from vaults Nos. 5 and 6. The total of plaintiff's alleged losses to June 6, 1925, was $5,965.83.

Plaintiff, however, did not notify defendant of his loss, nor make any demand upon defendant for the reimbursement thereof. He continued to store his fish in the vaults in question until the latter part of October, 1925. On October 28, 29, and 31, and November 2, 6, and 7, 1925, he sold all the fish he had in storage to the Eagle Fish Company, of New York, at a total loss, on account of their poor condition, of $10,919.14. All of this loss occurred on fish that came out of vaults 5 and 18. The loss on the fish that came out of the latter vault, however, was not caused by their damaged condition, but resulted from the re-

duced price at which plaintiff was compelled to sell them, in order to dispose of the fish that came out of the other vault.

The fish, unquestionably, deteriorated while they were stored in the defendant's plant. On their removal from the plant, they were found to be dry, rusty, and almost discolored; the rust having penetrated the skin and entered the meat. The effect of this condition was to make the fish, after being smoked, sour, bitter, and unpalatable.

■■■ Our examination of the evidence satisfies us that the deterioration in the fish was caused by the high and uneven temperature of the storage vaults in which they were kept. The duty of maintaining the proper temperature was upon the defendant company, under the express terms of its contract. Defendant contends, however, that it is not responsible for the improper temperature, for the reason that it was caused by plaintiff's employees in keeping the doors of the storage vaults open, permitting warm air to enter. Plaintiff claims, on the other hand, that the improper temperature was caused by defective condition of the storage vaults. There is a conflict in the testimony on these disputed points. The judge of the court below, who saw and heard the witnesses, resolved the dispute in favor of the plaintiff. From our own examination of the testimony, we find that defendant had full supervision at all times of its entire plant. Its guaranty of temperature was given with the full knowledge that the fish would be handled entirely by the employees of the plaintiff, so that it was incumbent upon it to see to it that these employees did nothing to impair its guaranty. If, at the time plaintiff's employees were going in and out of the storage vaults, defendant thought they were acting improperly, it should have kept a record of the temperature at the time, and the names of the workmen responsible therefor, reporting the matter to the plaintiff. This was not done. But our conclusion is that the high and uneven temperature was due to the defective condition of the vaults, resulting from their lack of repair. In these circumstances, the defendant is responsible, for it was its business to know that it could not maintain the temperature required because of the disrepair of the storage vaults. This responsibility applies, however, only to the loss which occurred up to and including June 6, 1925, amounting to $5,965.83.

■ While the defendant was legally charged with knowledge of the improper temperature and the defective condition of his plant, plaintiff acquired actual knowledge of these facts in March, 1925, when he withdrew from the storage vaults a carload of fish in a rusty condition and shipped it to New York, where, on account of their poor condition, he was compelled to sell the fish at a loss of more than $5,000. Nevertheless, he concealed the fact of the deterioration of the fish and his consequent loss from the defendant, and continued to place more fish in the storage vaults. He gave no notice and made no complaint to the defendant relative to the condition of the fish sold in October and November until after they were shipped. He made no demand upon defendant for damages until defendant, through its manager, exacted payment of the past-due storage charges amounting to approximately $5,000. At that time, plaintiff presented a claim for damages in an amount slightly in excess of $5,000.

We think the failure of the plaintiff to notify defendant of the deterioration of his fish and his resultant loss therefrom, and his continued use of the defective storage vaults, are, of themselves, sufficient to bar his recovery for any damages he may have suffered subsequent to June 6, 1925. It is too plain for argument that, if defendant's attention had been called to these facts, he could, and possibly would, have avoided the possibility of being charged with any loss arising from the improper storage of the fish after that date by the simple process of refusing to permit the

further use of the vaults by plaintiff until they were properly repaired. Plaintiff, however, apparently did not wish this to be done. He had fish to store, and he required a place in which to store them. This is shown by his action in the latter part of October, after he had the five holding vaults practically full, in electing to store, at his own risk, an overplus of fish in vault No. 13, known as the brine vault, in which 23 degrees, Fahrenheit, was the lowest possible temperature that could be maintained. These fish proved, subsequently, to be a total loss. Plaintiff had nothing to lose and everything to gain by the use of the defective storage vaults. If the fish which he placed therein did not deteriorate, he would not suffer any loss. If they did deteriorate, he still would not suffer any loss, because he was in a position to transfer the loss to the defendant company.

 The case of Parker v. Union Ice & Salt Co., 59 Kan. 628, 54 P. 672, 68 Am. St. Rep. 383, presented a state of facts similar to the case at bar. There suit was brought for the recovery of damages sustained by a certain lot of eggs while stored in the defendant's cold storage plant. The plaintiff and the president of the defendant company had numerous conversations concerning the erection of a cold storage warehouse. After it was erected, plaintiff frequently inspected the building and room in which the eggs were stored, before and while they were in storage, and his employees often handled the cases containing the goods. The court found that the defendant was negligent in its method of storage, but it also found that the plaintiff himself was guilty of negligence. The court announced the following rule, which we think is applicable here, viz.:

"The ordinary rules of liability for negligence and contributory negligence obtain in cases of bailment, such as the one in question. A bailor, who knows the unfitness of the place of storage of goods provided by his bailee, or who has equal opportunities with the bailee of knowing it, who sees and inspects the place of stor-

age, and who, there being no latent defects in it, passes judgment upon it as a fit place for his purposes, will be deemed equally at fault with the bailee if damage result to his goods."

In Perkins v. Meeker Sugar Refining Co., 163 La. 227, 111 So. 686, this court denied a recovery to the defendant on its reconventional for damages caused by the alleged failure of the plaintiff to deliver raw sugar for refining purposes, necessitating the closing of defendant's refinery for a number of days. One of the reasons assigned for the decision was defendant's failure to notify plaintiff that the shutdowns were about to occur, so as to afford him an opportunity to avoid them, if possible, or to mitigate the damage.

For the reasons assigned, the judgment appealed from is amended, by reducing the amount awarded plaintiff from $16,884.97 to $5,965.83, and, as thus amended, the judgment is affirmed; plaintiff and appellee to pay the costs of this appeal.

O'NIELL, C. J., is of the opinion that the plaintiff's demand should be rejected.

OVERTON, J., recused.