Gene C. FUGATE; Pearl H. Fugate, t/a Fugate Contract Carrier, Plaintiffs–Appellees,

v.

BROCKWAY, INC.; Marine Indemnity Insurance Company of America, Defendants–Appellants.

Edward C. NEAL, t/a Neal's Warehouse, Defendant,

v.

Ricky GRAHAM, t/a Graham's Exterminating Service, Third Party Defendant.

Gene C. FUGATE, Pearl H. Fugate, t/a Fugate Contract Carrier, Plaintiffs–Appellants,

v.

BROCKWAY, INC.; Marine Indemnity Insurance Company of America, Defendants–Appellees,

and

Edward C. NEAL, t/a Neal's Warehouse, Defendant,

v.

Ricky GRAHAM, t/a Graham's Exterminating Service, Third Party Defendant.

Nos. 89–2711, 89–2719.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 1, 1990.

Decided June 21, 1991.

As Amended July 11, 1991.

Robert T. Vaughan, Jr., argued (James A.L. Daniel, of counsel), Daniel, Vaughan, Medley & Smitherman, P.C., Danville, Va., for defendants-appellants.

James Warren Haskins, argued (Robert L. Bushnell, of counsel), Young, Haskins, Mann & Gregory, P.C., Martinsville, Va., for plaintiffs-appellees.

Before SPROUSE and WILKINSON, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

SPROUSE, Circuit Judge:

This appeal concerns a dispute between a warehouseman, Fugate Contract Carrier ("Fugate"),[1] and Brockway, Inc. ("Brockway"), a depositor of glass bottles, concerning liability for pest infestation of the area in Fugate's warehouse where the bottles were deposited. A jury found that Fugate's negligence proximately caused the damages resulting from the infestation, but found that Brockway could not recover because it had been contributorily negligent. The principal issue is whether the district court correctly charged the jury that Brockway's claim could be defeated by its contributory negligence. Finding that, as a matter of law, Brockway was not contributorily negligent, we reverse.

I

Brockway manufactures glass bottles and sells many of its bottles to Miller Brewing Company. The business relationship between Brockway and Fugate began in 1978, when Fugate transported glass bottles by truck from Brockway's plant in Pittsylvania County, Virginia, to a Miller Brewing Company facility in Eden, North Carolina. In January 1985, however, Fugate became an independent warehouseman and began to store Brockway's bottles, initially in a warehouse located in the Laurel Park area of Henry County, Virginia (the "Laurel Park facility").

Brockway customarily inspected all warehouses before approving them. Pursuant to this policy, its representatives inspected and approved the Laurel Park facility. At that time, Brockway provided Fugate with basic instructions on its needs regarding warehouse operations and sanitation criteria, which included minimum guidelines regarding pest control. Brockway also provided Fugate with a copy of the Brockway Handbook (the "Handbook"), which contains instructions for receiving, storing, shipping, and loading wares. The Handbook text is prefaced by the statement that "[i]t is the responsibility of a Brockway public warehouse to be *accountable* for Brockway's inventory as it passes

---

1. Gene C. Fugate and Pearl H. Fugate operate    Fugate Contract Carrier.

through their [sic] warehouse facility." (Emphasis in original.) The Handbook also emphasizes the need for an insect-free environment and the correlative need to regularly exterminate the warehouse. It is undisputed that Fugate understood that it was responsible for complete elimination of any insects prior to storing Brockway's bottles and for maintaining the warehouse in that condition while the bottles were stored there.

To comply with its contractual responsibility to exterminate the Laurel Park facility, Fugate employed Ricky Graham, a professional exterminator. Gene Fugate explained to Graham that the facility must be completely insect-free and that the warehouse must be maintained to the standards required by Brockway. He suggested that Graham contact Brockway's representative for details concerning its standards. In a telephone conversation initiated by Graham, a Brockway employee reiterated that the extermination procedures must be complete and, in response to Graham's question, provided the latter with a list of extermination chemicals that Brockway considered adequate for use in insect control. Graham "bombed" the Laurel Park facility and performed other extermination services twice a month there. The parties concede that during the fourteen months the Brockway bottles were stored at the Laurel Park facility there was no evidence of any insects nor were there complaints from any customers concerning the condition of the bottles.

In March 1986, Fugate desired to change its warehouse operation from Laurel Park to a facility in Danville, Virginia, known as Neal's warehouse. Jim Wescott, a Brockway customer service representative with twenty-seven years of experience, visited and inspected Neal's warehouse. Wescott recommended that Brockway approve Neal's warehouse, subject to Fugate fencing away from the warehouse an outdoor basketball court, weed cutting, and pest control. Gene Fugate acknowledged that he understood that proper extermination was completely Fugate's responsibility. It is also uncontroverted that during Wescott and Fugate's joint inspection, Neal's warehouse appeared "clean," free of insects and other problems, and superior to the Laurel Park facility.

Fugate again employed Graham to conduct the extermination before Fugate received any of Brockway's wares at that facility. It is undisputed that Graham understood the necessity for an insect-free warehouse and utilized the extermination procedures he thought would produce that environment at Neal's warehouse. Within a very short time, Brockway diverted its delivery of bottles from the Laurel Park warehouse to Neal's warehouse.

Some six weeks later, however, Miller Brewing Company discovered cockroaches in some of the bottles delivered to them from Neal's warehouse. A consequent inspection revealed that thousands of cockroaches were present under the concrete slabs of the warehouse floor. They could not be seen under normal conditions but when pesticide was forced through the expansion joints between the concrete slabs, they emerged from their hidden nesting places. The discovered infestation required the removal of the glassware, "bottle-by-bottle" inspection, and increased extermination efforts.

Fugate sued Brockway to recover its expenses of $88,134.88 and other contended damages. Brockway counterclaimed, demanding that Fugate reimburse it in the amount of $273,346. Fugate then filed a third-party complaint against Graham, seeking to hold the latter liable for the damages. After jury trial, the district court issued seven special interrogatories. The first three asked:

1. Do you find from a preponderance of the evidence that the roaches discovered in Neal's warehouse on April 28, 1986 were already in Neal's warehouse on March 15, 1986 and did not come from a Brockway source?

JURY ANSWER: Yes.

2. Do you find from a preponderance of the evidence that the Fugates failed to exercise reasonable care to prevent or control the insect infestation which occurred at Neal's warehouse and that

such failure to use reasonable care proximately caused, in whole or in part, the contamination of Brockway glassware in the warehouse?

JURY ANSWER: Yes.

3. Do you find from a preponderance of the evidence that Brockway failed to use reasonable care to inspect the warehouse for sanitation considerations and that such failure to use reasonable care contributed to the contamination of the Brockway glassware in the warehouse?

JURY ANSWER: Yes.

The four remaining interrogatories related to other possible failures by Fugate to use reasonable care, to the possible failure by Graham to use reasonable care, and to damages. Following the court's instruction, the jury, after answering the first three interrogatories affirmatively, proceeded no further, finding that Brockway could not recover because of its contributory negligence.

After judgment, Brockway filed a motion for judgment notwithstanding the verdict, claiming that the question concerning contributory negligence, implicit in interrogatory number three, was legally improper and that, even if proper, the evidence was insufficient to support the jury's findings. The district court, citing *Continental Group, Inc. v. Lincoln Land Moving and Storage, Inc.,* 710 F.2d 368 (7th Cir.1983), denied Brockway's motion, holding that contributory negligence on the part of a bailor is a proper issue for decision by the trier of fact and that there was sufficient evidence to justify the jury submission. Brockway appeals. Fugate cross-appeals, asserting that the district court erred when it failed to grant its motion for directed verdict on the issue of primary negligence and when it charged the jury concerning Graham's agency relationship with it.

## II

On appeal, Brockway contends that it could not be contributorily negligent in this case since under Virginia law, it had no duty to inspect a warehouse where it stores its goods and that even if there were such a duty, there was not sufficient evidence of

its negligent inspection to permit a jury to consider the issue. Fugate, on the other hand, contends that Brockway assumed the duty when it chose to inspect the facility before approving it and, once it assumed this duty, it conducted the inspection negligently.

The basic rule of a warehouseman's liability for goods in his care is set forth in § 8.7–204(1) of the Virginia Uniform Commercial Code, which states:

A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care.

In *Canty v. Wyatt Storage Corp.,* 208 Va. 161, 156 S.E.2d 582 (1967), the Supreme Court of Appeals of Virginia stated that "[b]oth the former and present sections [§ 8.7–204(1) and its predecessor] restate the principles of the common law as to the liability of a warehouseman for failure to exercise care." *Canty,* 156 S.E.2d at 584. Brockway contends that § 8.7–204(1) imposes no duty on the bailor to inspect the warehouse nor does it mention contributory negligence as a bar to a bailor's recovery. According to Brockway, the only duty it had was to furnish the goods to Fugate in good condition, which it did. Fugate, however, asserts that § 8.7–204(1) was not intended to displace the common-law and that the common-law holds that a bailee is not responsible for the losses resulting from the bailor's contributory negligence.

While there appears to be no Virginia case directly on point, other jurisdictions have held that a bailor's contributory negligence can bar his recovery for damage to goods occurring while in the possession of a warehouseman. *See Ray v. Alexandria Ice & Cold Storage Co.,* 166 La. 1091, 118 So. 323, 325 (1928) (quoting *Parker v. Union Ice & Salt Co.,* 59 Kan. 626, 54 P. 672 (1898)); *see also Continental Group, Inc. v. Lincoln Land Moving and Storage, Inc.,* 710 F.2d 368, 373 (7th Cir.1983); 78

Am Jur.2d, Warehouses § 142 (1975); W. Towle, *Warehousing Law*, 78–86 (1988).

We need not, however, determine whether under Virginia law contributory negligence would be a bar to recovery in these circumstances, for we conclude that, as a matter of law, Brockway was not contributorily negligent. Neither the statute nor the common-law imposes a duty on Brockway to inspect the warehouse. Admittedly, Brockway did inspect the warehouse to see if the facility would satisfy its needs. Brockway conditioned approval, however, on Fugate's maintaining the premises free of insects. Had it unconditionally selected the warehouse and, with Fugate, been equally able to observe a patent condition posing a threat to sanitary storage, we might need to determine the legal issue of contributory negligence. The infestation under the concrete slabs, however, was a latent condition, which neither Brockway nor Fugate could have been alerted to by a walk-through inspection. Fugate's duty to exercise reasonable care, however, under these circumstances, extended to the latent condition—Brockway's did not. In our view, the net effect of Brockway's efforts was to choose a warehouseman and to monitor the correctness of its choice. It is true that Wescott, Brockway's representative, inspected Neal's warehouse and recommended approval of its use. Witnesses for both parties, however, acknowledged that the approval was subject to a vigorous program of preventing insect encroachment and that Fugate acknowledged its responsibility to effect the extermination program.

Nowhere is there evidence that Fugate relied on Brockway either to perform or supervise any of the exterminating service. Providing the Handbook to Fugate and a list of effective pesticides to the exterminator Graham was not calculated to relieve Fugate of its duty to perform its responsibilities carefully. To the contrary, it evinces an insistence that Fugate fully recognize its responsibility and fully perform its duties.

Moreover, those cases which recognize the defense of contributory negligence are distinguishable from the instant case, for they presented circumstances in which the bailor had definite knowledge of a patent defect and did not act. For example, in *Parker,* the bailor stored eggs, after visual inspection, in a facility sheeted on the inside with pine boards. The eggs became tainted with the odor of the hard pine. In holding for the bailee, the court stated:

> A bailor, who knows the unfitness of the place of storage of goods provided by his bailee, or who has equal opportunities with the bailee of knowing it, who sees and inspects the place of storage, and who—there being no latent defects in it—passes judgment upon it as a fit place for his purposes, will be deemed equally at fault with the bailee if damage results to his goods.

*Parker,* 54 P. at 672. In *Ray,* fish were delivered and stored in a cold storage plant, but due to the high temperature of the storage · facility, the fish spoiled. The court, however, refused the bailor recovery because the fish were delivered to, and handled in, the bailee's storage spaces by employees of the bailor, who were in a position to know that the temperatures were improper. More importantly, the court found that the bailor had "actual knowledge" of the improper temperature conditions, stating:

> [P]laintiff acquired actual knowledge of [the improper conditions] when he withdrew from the storage vaults a carload of fish in a rusty condition and shipped it to New York, where, on account of their poor condition, he was compelled to sell the fish at a loss of more than $5,000. Nevertheless, he concealed the fact of the deterioration of the fish and his consequent loss from the defendant, and continued to place more fish in the storage vaults. He gave no notice and made no complaint to the defendant relative to the condition of the fish sold in October and November until after they were shipped....
>
> We think the failure of the plaintiff to notify defendant of the deterioration of his fish and his resultant loss therefrom, and his continued use of the defective

storage vaults, are, of themselves, sufficient to bar his recovery for any damages he may have suffered subsequent to June 6, 1925.

*Ray*, 118 So. at 324–25.

In this case, Brockway was completely unaware of the presence of the insects and, in fact, accepted Neal's warehouse only on the condition of extermination procedures adequate to eliminate any bugs that could not have been seen on visual inspection. It did not take over the extermination of the warehouse nor even supervise it. Its only statutory duty was to deliver its goods in good condition and viz-a-viz Fugate it assumed no other duty. Its inspection and general instructions to Fugate and other independent handlers of its bottles were in response to its responsibilities as a producer of bottles and did not cross the line of relieving Fugate under the rubric of contributory negligence.

In view of the above, the district court erred in denying Brockway's motion for judgment notwithstanding the verdict on the question of Fugate's liability to it. We, therefore, reverse and remand with instructions to enter judgment for Brockway on the issue of Fugate's liability. Since the jury did not consider the issue of damages owed by Fugate to Brockway nor the issue raised by Fugate's third-party complaint against Graham, a new trial will be required to resolve those issues. Finally, we find no merit to Fugate's cross-appeal.

REVERSED AND REMANDED WITH INSTRUCTIONS.